**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

BAYER PHARMA AG, BAYER )
INTELLECTUAL PROPERTY GmbH, )
and BAYER HEALTHCARE )
PHARMACEUTICALS INC., )
)
        Plaintiffs, )
)
v. )     Civil Action No. 12-1726-LPS-CJB
)
WATSON LABORATORIES, INC., )
)
        Defendant. )

**MEMORANDUM ORDER**

      In this Hatch-Waxman action involving Plaintiffs Bayer Pharma AG, Bayer Intellectual

Property GmbH, and Bayer Healthcare Pharmaceuticals Inc. (collectively, "Bayer" or

"Plaintiffs") and Defendant Watson Laboratories, Inc. ("Watson" or "Defendant"), Bayer alleges

infringement of U.S. Patent No. 8,071,577 (the "'577 Patent"). Pending before the Court is

Watson's motion to compel Bayer to provide a complete and responsive answer to Watson's

Interrogatory No. 7, filed pursuant to Federal Rule of Civil Procedure 37(a) (the "motion to

compel"). (D.I. 59) For the reasons discussed below, the Court GRANTS Watson's motion, to

the degree set out below.

**I.     BACKGROUND**

    **A.    Factual Background**

      The '577 Patent claims Bayer's drug product known as Natazia®, an FDA-approved oral

contraceptive that prevents pregnancy in women and treats heavy menstrual bleeding in women

without organic pathology. (D.I. 1 at ¶ 15) Prior to the invention of Natazia®, six inventors

(Michael Dittgen, Sabine Fricke, Herbert Hoffmann, Claudia Moore, Michael Oettel, and

Monika Ostertag) (collectively, the "Dittgen Group") at Bayer's subsidiary, Jenapharm GmbH ("Jenapharm"), had created a novel oral contraceptive regimen (the "Dittgen regimen").[1] (D.I. 61, ex. 2; D.I. 63 at 3)  The Dittgen regimen was covered by United States Patent Application No. 09/950,915 (the "'915 Application"), which was being prosecuted in 2004 by Bayer's then-outside U.S. counsel Michael J. Striker ("Striker").  (D.I. 71 at 2-3)  The '915 Application is a divisional of a U.S. patent application, which, in turn, is a continuation of another U.S. patent application that issued to the Dittgen Group as U.S. Patent No. 6,133,251.  (D.I. 61, ex. 2 at 2)  It was subsequently discovered that the Dittgen regimen did not work.  (D.I. 63 at 3; D.I. 71 at 2)

According to Bayer, Natazia® is the solution to the problems inherent in the Dittgen regimen's failings, a solution invented by Jan Endrikat and Bernd Duesterberg ("Endrikat and Duesterberg").  (D.I. 63 at 3)  In April 2004, Jenapharm filed a German patent application with respect to the Natazia® regimen, No. DE 2004/019,743 ("DE '743"), before any activity relating to its patenting in the United States occurred.  (D.I. 61, ex. 4 at 1; *id.*, ex. 6 at 1; D.I. 71 at 4)  On November 3, 2005, the Patent Cooperation Treaty ("PCT") Application based on DE '743 was filed, naming Endrikat and Duesterberg as inventors.  (D.I. 71, ex. F)  Striker then filed this application in a United States national phase on October 18, 2006 as U.S. Patent Application No. 11/578,771 (the "'771 Application").  (D.I. 61, ex. 6; D.I. 71 at 4)  As part of this process, Striker filed a Declaration and Power of Attorney in which Endrikat and Duesterberg each declared that

---

[1]  Prior to 2006, Bayer's predecessor Schering AG was the majority shareholder in Jenapharm; in 2006 Bayer acquired Schering AG and acquired control of Jenapharm, which is today a Bayer subsidiary.  As there appears no dispute that any privilege enjoyed by Jenapharm passed from Schering AG to Bayer when Bayer acquired control of Jenapharm, the Court will at times refer to Schering AG as "Bayer" when referencing activity occurring in and prior to 2006. (D.I. 71 at 1 & n.1; D.I. 74 at 1 & n.1)

2

they were the "original, first and joint inventor" of the Natazia® regimen. (D.I. 61, ex. 4) The '771 Application identified Bayer's predecessor, Schering AG, as the assignee. (*Id.*, ex. 6) The first office action for this application was not issued until July 27, 2009. (D.I. 71 at 4) The '771 Application ultimately issued as the '577 Patent on December 6, 2011, listing Endrikat and Duesterberg as inventors. ('577 Patent at 1)

However, on July 15, 2004, a little over two years before the filing of the '771 Application, Striker had filed an essentially identical U.S. patent application, No. 10/891,729 (the "'729 Application"), that also claimed the Natazia® regimen. (D.I. 61, ex. 2) In this application, though, Striker listed the Dittgen Group, and not Endrikat and Duesterberg, as inventors. (*Id.*) As part of the '729 Application process, all six of the Dittgen Group inventors signed sworn affidavits claiming that they were "the original joint inventors" of the Natazia® regimen. (*Id.*, ex. 3) The '729 Application listed Jenapharm (instead of Bayer's predecessor Schering AG) as the assignee. (*Id.*, ex. 5) The '729 Application was filed as a continuation-in-part of the '915 Application, which covered the Dittgen regimen. (*Id.*, ex. 2; D.I. 71 at 2-3)

On November 14, 2008, the U.S. Patent and Trademark Office ("PTO") rejected the claims of the '729 Application on the grounds of non-statutory obviousness-type double patenting, in light of a prior patent that had been issued to the Dittgen Group, U.S. Patent No. 6,884,793 (the "'793 Patent"). (D.I. 61, ex. 11 at 7-10) As a result of the rejection, on February 13, 2009, Striker terminally disclaimed the '729 Application to the '793 Patent, meaning the '729 Application would expire no later than 2016, a decade earlier than it would have otherwise expired. (D.I. 61 at 2 & ex. 5) On December 4, 2009, the PTO issued a Notice of Allowance for the '729 Application. (D.I. 71 at 3)

Following the terminal disclaimer of the '729 Application, a new attorney, Anthony

Zelano ("Zelano"), assumed responsibility for both the '729 Application and the '771

Application. (D.I. 61, ex. 12 at 13) Bayer ultimately abandoned the '729 Application on March

19, 2010. (D.I. 74 at 5) In a document later filed with the PTO in connection with the '771

Application, Zelano stated that the filing of the '729 Application—which claimed the same

subject matter but named different inventors—"was a result of a mistake on the part of the other

inventive entity." (D.I. 61, ex. 12 at 11) Zelano noted that "[a]s previously stated, a document

confirming that a mistake was involved is now being finalized and a signed version will be filed

shortly." (*Id.*)

Indeed, in August 2010, a Bayer representative, Ina Scherlitz-Hofmann, had e-mailed a

document—a draft declaration describing the circumstances behind the alleged mistake from the

Dittgen Group's perspective—to the Dittgen Group inventors, and requested that they sign it.

(D.I. 71, ex. H; D.I. 72, ex. 3-4) At that time, at least some of the Dittgen Group inventors were

no longer employed with Jenapharm. (*See, e.g.*, D.I. 72 at 3 & exs. 3-4) By the Fall of 2011,

Bayer was still seeking the Dittgen Group's signature on such a draft declaration; by this time,

the Dittgen Group inventors had sought the assistance of independent counsel with respect to

Bayer's request that they sign the document. (*Id.*, ex. 6 at 4-8; D.I. 74 at 2) The Dittgen Group

ultimately refused to sign, explaining to Bayer's representative that "in [their] opinion it does not

accurately reflect the matter (who invented what)" and, moreover, the patent attorneys with

whom they consulted "are somewhat suspicious of the current declaration." (D.I. 72, ex. 6 at 5)

Bayer ultimately never filed a declaration (or any other document confirming the alleged

mistake) with the PTO. (D.I. 71 at 8; D.I. 72, ex. 6 at 3)

4

## B.    Procedural Background

This case arises out of Watson's submission of Abbreviated New Drug Application

("ANDA") No. 202349 to the United States Food and Drug Administration ("FDA"), which

seeks approval to market a generic version of Bayer's Natazia® product. (D.I. 1 at ¶ 1)  Bayer

filed suit against Watson on December 18, 2012, alleging that Watson's submission of ANDA

No. 202349 infringes at least one claim of the '577 Patent under 35 U.S.C. § 271(e)(2). (D.I. 1)

On February 15, 2013, the Court was referred this case by Judge Leonard P. Stark to hear and

resolve all pretrial matters, including the resolution of case-dispositive motions. (D.I. 15) The

Court subsequently issued a Scheduling Order that set February 28, 2014 as the deadline for

completion of fact discovery. (D.I. 24 at ¶ 3(j)) The parties later stipulated to extend the fact

discovery deadline to April 15, 2014. (D.I. 76)

On March 26, 2013, Watson served its First Set of Interrogatories on Bayer, seeking, *inter*

*alia*, additional information relating to the alleged mistake in the filing of the '729 Application.

(D.I. 61, ex. 7)  Specifically, Watson's Interrogatory No. 7 requests of Bayer:

> To the extent you claim that the filing and/or prosecution of the '729
> application was a mistake, identify in detail how the mistake was made,
> the dates and circumstances under which the mistake was committed and
> discovered, and the five persons most knowledgeable about the
> commission of the mistake and its discovery.

(*Id.*, ex. 7 at 11)  In its response, served on November 21, 2013, Bayer objected to the

interrogatory on the ground that it calls for disclosure of attorney-client privileged

communications or material protected by other privileges. (*Id.*, ex. 9 at Answer to Interrogatory

No. 7)  Substantively, subject to its objection and to Federal Rule of Civil Procedure 33(d), Bayer

stated only that "the patent prosecution history speaks for itself." (*Id.*)  In briefing on the instant

5

motion, Bayer provided additional "limited non-privileged information concerning the

commission and discovery of the mistaken filing of the '729 Application":

> The mistake was made on July 15, 2004, when the '729 Application was
> filed incorrectly listing the Dittgen [G]roup as the inventors of the subject
> matter claimed therein. The '729 Application was abandoned on March
> 19, 2010. The communications with U.S. patent counsel regarding the
> preparation and prosecution of this patent application are logged with the
> requisite detail in the privilege log Bayer has provided to Watson in
> connection with Bayer's document production. [] In addition, the
> attorneys who filed and prosecuted the '729 Application are the individuals
> most knowledgeable about the mistake, and their identity is disclosed in
> the '729 Application itself (Michael Striker and Anthony Zelano).

(D.I. 74 at 4-5)

On December 3, 2013, after the parties failed to reach agreement on the issue, Watson

filed its motion to compel. (D.I. 59, 61) On December 16, 2013, the Court held a teleconference

with the parties; it thereafter ordered additional briefing on the issue, which was complete on

January 10, 2014. (D.I. 79 (hereinafter, "Tr."); *see also* D.I. 67, 74)[2]

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 37 applies to motions to compel discovery, providing

that "[o]n notice to other parties and all affected persons, a party may move for an order

compelling . . . discovery." Fed. R. Civ. P. 37(a)(1). Under Federal Rule of Civil Procedure

26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to

any party's claim or defense[.]" If an objection is raised as to relevancy, the party moving to

compel discovery bears the burden of demonstrating the relevance of the requested information.

*Inventio AG v. ThyssenKrupp Elevator Am. Corp.*, 662 F. Supp. 2d 375, 381 (D. Del. 2009);

---

[2]      Watson's motion also raised issues with respect to certain other interrogatories
that were resolved during and after the teleconference.

*Standard Chlorine of Delaware, Inc. v. Sinibaldi*, 821 F. Supp. 232, 258 (D. Del. 1992). While the Federal Rules permit broad discovery, one limit on a party's right to discovery is that it may not gain access to otherwise relevant material protected by an evidentiary privilege. *See, e.g., Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000).

The attorney-client privilege protects confidential communications between a client and its attorney made for the purpose of securing legal advice. *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 862 (3d Cir. 1994).[3] The privilege applies only if there is (1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client. *In re Chevron Corp.*, 650 F.3d 276, 289 (3d Cir. 2011). While the privilege protects communications between privileged persons, it does not protect the facts underlying those communications. *Brigham and Women's Hosp. Inc. v. Teva Pharms. USA, Inc.*, 707 F. Supp. 2d 463, 469 (D. Del. 2010) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981)).

Because the privilege militates against the general rule promoting full disclosure of information between parties to a lawsuit, courts must construe it narrowly. *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1423 (3d Cir. 1991). A party seeking to protect information from disclosure in reliance on the attorney-client privilege bears the burden of

---

[3]      In this federal patent infringement suit, federal common law applies to questions of privilege. Fed. R. Evid. 501; *see also Pearson*, 211 F.3d at 66. In patent cases, regional circuit law governs disputes relating to the applicability of the attorney-client privilege and related privileges/doctrines, to the extent that those issues are not unique to patent law. *See, e.g., In re Google Inc.*, 462 F. App'x 975, 977 (Fed. Cir. 2012). However, when a determination of the applicability of such a privilege implicates a substantive patent law issue, the law of the United States Court of Appeals for the Federal Circuit applies. *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 803-04 (Fed. Cir. 2000); *Shire Dev. Inc. v. Cadila Healthcare Ltd.*, C.A. No. 10-581-KAJ, 2012 WL 5247315, at \*3 (D. Del. June 15, 2012).

7

establishing the privilege. *In re Grand Jury*, 705 F.3d 133, 160 (3d Cir. 2012); *United States v. Veolia Env't N. Am. Operations, Inc.*, Civ. No. 13-mc-03-LPS, 2013 WL 5779653, at *4 (D. Del. Oct. 25, 2013).

In line with the narrow construction that it receives, "[t]he privilege protects *only* those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege." *Westinghouse*, 951 F.2d at 1423-24 (internal quotation marks and citation omitted). Accordingly, a party's voluntary disclosure to a third party of information purportedly protected by the attorney-client privilege destroys the information's confidentiality, thus obviating the privilege. *Id.* at 1424. Because the privilege belongs to the client, not the attorney, only the client may waive it. *Brigham & Women's Hosp.*, 707 F. Supp. 2d at 469-70.

## III. DISCUSSION

### A. Relevance of Requested Information

This dispute concerns Watson's desire to discover additional details regarding Bayer's filing of the '729 Application, which Bayer alleges was a mistake. As an initial matter, Bayer disputes the relevance of such information to the instant action. (*See* Tr. at 35; D.I. 71 at 10) For its part, Watson explains that "[t]he requested information is plainly relevant to the issue of proper inventorship and potential inequitable conduct issues." (D.I. 61 at 4)

The Court agrees with Watson that Interrogatory No. 7 seeks relevant information, as that term is broadly defined by Rule 26(b)(1). Watson has served its Initial Invalidity Contentions on Bayer, and one such contention is that the '577 Patent is invalid for failure to name the correct inventors under 35 U.S.C. § 116 and/or invalid under 35 U.S.C. § 102(f) because the named inventors derived their claimed invention from others. (D.I. 61, ex. 10 at 25-26) This contention

8

is based on Watson's assertion that the Dittgen Group should have been named as either joint or sole inventors of the '577 Patent. (*Id.*) Watson is entitled to discovery on its invalidity contentions, and Interrogatory No. 7 seeks additional details about why the Dittgen Group were named as inventors on an application claiming the same invention as that covered by the '577 Patent. Accordingly, the Court finds that Interrogatory No. 7 seeks information that "appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

**B.    Alleged Privileged Status of Communications Relating to Alleged Mistake**

The Court next turns to issues of privilege. Bayer argues that it cannot provide Watson with any further details regarding the alleged mistake, as "[t]he events leading to th[e] mistake and its discovery involve privileged attorney-client communications." (D.I. 71 at 1; *see also* D.I. 63 at 3; D.I. 74 at 1) There are four identifiable categories of communications regarding the alleged mistake that Bayer identifies in its briefing as being subject to the attorney-client privilege or another privilege discussed below (and thus, that the Court can meaningfully address): (1) communications between Jenapharm's counsel and its outside counsel Striker relating to the filing of the '729 Application; (2) communications between Jenapharm's counsel and the Dittgen Group inventors during the prosecution of the '729 Application; (3) communications between Bayer and Zelano subsequent to the discovery of the alleged mistake; and (4) communications between Bayer's representative and the Dittgen Group inventors about the alleged mistake in 2010 and 2011, after at least some of the inventors were no longer working for Jenapharm. (D.I. 71 at 5-6; D.I. 74 at 1-2) Bayer argues that there is almost no non-privileged information regarding the alleged mistake that it can disclose to Watson, since virtually all communications relating to the alleged mistake are privileged. (D.I. 74 at 1, 4-5)

9

Thus, in order to determine whether Bayer can provide additional information to Watson by way of an answer to the disputed interrogatory, it is necessary to first examine the different categories of communications in dispute that relate to the alleged mistake. The Court can only address whether privilege has been established as to communications about which it has been made aware.

### 1. Communications Between Jenapharm's Counsel and Its Outside Counsel Striker Relating to the Filing of the '729 Application

The Court agrees with Bayer that the communications between Jenapharm's counsel and Jenapharm's U.S. patent counsel Striker regarding the preparation and prosecution of the '729 Application (those attached as exhibits A through E of Plaintiff's opening brief) are protected by the attorney-client privilege. (D.I. 71 at 5-6) The nature of the documents themselves, (*id.*, ex. A-E), as well as related information provided about such communications in the *In Camera* Declaration of Anthony Zelano, (*id.*, ex. I at ¶ 11 (hereinafter "Zelano Declaration")), demonstrate that these are confidential communications between a client and counsel made for the purpose of securing legal advice for the client. *In re Chevron Corp.*, 650 F.3d at 289.

### 2. Communications Between Jenapharm and the Dittgen Group Inventors During Prosecution of the '729 Application in 2004

Bayer argues that while employed at Jenapharm, the Dittgen Group received privileged legal advice from Jenapharm's patent counsel that resulted in their being listed as inventors of the Natazia® regimen in the '729 Application. (D.I. 74 at 1-2) While the Court does not have before it any specific communications falling into this category, the rough draft declaration attached to Bayer's briefing (which will itself be addressed in further detail below) describes that purported legal advice. (D.I. 71, ex. H) For purposes of this Memorandum Order, the Court will

assume such communications regarding the '729 Application occurred between the Dittgen

Group and Jenapharm, while the inventors were still employed by Jenapharm, and are protected

by the attorney-client privilege. *See Am. Broadcasting Cos. v. Aereo Inc.*, Nos. 12 Civ.

1540(AJN)(HBP), 12 Civ. 1543(AJN)(HBP), 2013 WL 5526282, at *5 (S.D.N.Y. Oct. 7, 2013)

(noting that there is "no question that confidential communications between an inventor and his

or her patent attorney made for purpose of securing legal advice are privileged") (citing *In re*

*Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 805-06 (Fed. Cir. 2000)); *Medicines Co. v.*

*Mylan Inc.*, 936 F. Supp. 2d 894, 900 (N.D. Ill. 2013) ("The attorney-client privilege protects

communication[s] between an attorney and her client, [] and extends to communications between

an inventor and a patent attorney."); *Brigham & Women's Hosp. Inc.*, 707 F. Supp. 2d at 470

(noting that "it is undisputed that the attorney-client privilege applies to communications

between the inventors and their attorneys regarding disclosure of [a patent application]" as

"[s]uch communications between client and counsel for the purpose of obtaining legal advice

clearly fall within the scope of the privilege").

### 3. Communications Between Bayer and Zelano Subsequent to the Discovery of the Alleged Mistake

Bayer argues that all confidential communications between Zelano and Bayer with

respect to how to address the mistake, following its discovery, are also privileged. (D.I. 71 at 6)

The only document presently before the Court that potentially falls into this category is the

"Rough Draft Declaration" produced to the Court by Bayer *in camera*. (D.I. 71, ex. H) The

Zelano Declaration suggests that Zelano sent the Rough Draft Declaration to Dr. Scherlitz-

Hofmann, and that there were subsequent communications between Bayer and Zelano regarding

the draft declaration and the '771 Application. (Zelano Declaration at ¶¶ 17-19)  To the extent

that the Rough Draft Declaration is a different version than that later sent to the Dittgen Group,

and was disclosed only to Bayer and not to third parties, the Court concludes that, as a draft

prepared by Zelano and communicated to the client for the purpose of providing legal advice and

services, it is protected by the attorney-client privilege. *See Rohm & Haas Co. v. Brotech Corp.*,

815 F. Supp. 793, 796-97 (D. Del. 1993).  Additionally, based on the content of the Zelano

Declaration, (Zelano Declaration at ¶ 19), the Court has no reason to believe that any other

communications falling into this category would not be privileged.

### 4.    Communications Between Bayer's Representative and the Dittgen Group Inventors About the Alleged Mistake in 2010 and 2011

In 2010 and again in 2011, following the discovery of the alleged mistake and in pursuit

of filing with the PTO an explanatory declaration signed by the Dittgen Group, Bayer's

representative Ina Scherlitz-Hofmann had a number of communications with the Dittgen Group

inventors.  It is undisputed that by the time Bayer first attempted to secure a signed declaration

from the Dittgen Group inventors in 2010, at least some of the inventors were no longer

employed by Bayer, and they eventually obtained their own independent lawyers and ultimately

refused to sign the declaration.  (D.I. 72 at 2)

Bayer concedes that communications regarding the mistake between Bayer and the

Dittgen Group following the inventors' decision in the Fall of 2011 to retain separate counsel are

*not* privileged.  (D.I. 74 at 2)  Watson attached an e-mail thread falling into this category to its

responsive briefing.  (D.I. 72, ex. 6)  The contents of these e-mails, between certain members of

the Dittgen Group and Scherlitz-Hofmann, do not disclose the circumstances that led to the

alleged mistake or its discovery. (*Id.*) Rather, the e-mails reflect Bayer's efforts to have the

Dittgen Group inventors sign the draft declaration (which does not appear to have been attached

to the 2011 e-mail thread that is before the Court), and the Dittgen Group's reluctance (and

ultimate refusal) to do so, "since in [their] opinion [the declaration] does not accurately reflect

the matter (who invented what)." (*Id.* at 6)

The key communications with respect to this dispute are the 2010 communications, and

certain of these e-mails from Scherlitz-Hofmann to the Dittgen Group contain an icon indicating

that they attached the draft declaration that Bayer wished the inventors to sign. (D.I. 72, exs. 3-4)

The actual attachments are not included along with the 2010 e-mail communications that are

before the Court, but it is possible that the e-mailed versions of the declaration contained

privileged information relating to the mistake.

Bayer argues that these 2010 communications remain privileged as to third parties such as

Watson. (D.I. 74 at 2)[4]  While Bayer's position is not exactly clear, it appears to make two

---

[4]       Bayer submitted much of its briefing and accompanying exhibits to the Court *in camera*, serving redacted versions on Watson. (D.I. 71; D.I. 74)  For instance, in the reply brief that it served upon Watson, Bayer redacted, *inter alia*, the description of its legal positions regarding the protection that should be afforded to communications between Jenapharm and the Dittgen Group in 2004 while the inventors where still employed there, and to communications between Bayer and the Dittgen Group in 2010 and 2011, both prior to and after the Dittgen Group obtained independent counsel. (D.I. 74 at 1-2)  However, the Court does not agree that *in camera* submission of such content is appropriate use of *in camera* review.  *Cf. Bogosian v. Gulf Oil Corp.*, 738 F.2d 587, 596 (3d Cir. 1984) (explaining that *in camera* inspection is a procedure to be utilized "in the few situations where public policy requires protection of portions of a document").  There is nothing privileged about Bayer's concession that certain documents are *not* privileged.  As for Bayer's assertions regarding communications in 2004 and 2010, aside from acknowledging the existence of such communications and providing a legal position as to whether they are privileged, Bayer does not reveal the *substance* of any protected communications in these passages.  To the extent that inappropriately redacted information in Bayer's briefing is relevant to resolution of the instant motion, the Court discusses such information herein.

distinct arguments with respect to these communications. First, Bayer asserts that Scherlitz-Hofmann's "discussion with the Dittgen [G]roup of the privileged advice they received does not waive privilege as to that advice[.]" (*Id.*) Thus, the Court understands Bayer's argument to be that to the extent that these 2010 communications directly reflect the substance of previous privileged 2004 communications between Jenapharm and the Dittgen Group, the content of those 2004 communications remains privileged since the Dittgen Group were the actual recipients of that advice while employed at Jenapharm. Second, to the extent these 2010 communications include content beyond direct reference to the 2004 privileged communications, Bayer appears to argue that this content is also protected by the joint-client privilege. (*Id.*)

As to Bayer's first argument, the Court agrees that any portions of the 2010 communications between Bayer and the Dittgen Group that directly reference 2004 privileged communications are themselves protected by the attorney-client privilege. It is well-settled that the attorney-client privilege survives the termination of the attorney-client relationship. *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 440 (1977); *United States v. Kleifgen*, 557 F.2d 1293, 1297 (9th Cir. 1997). Relatedly, privileged communications between an employee and corporate counsel do not lose their protection when the employee leaves the corporation. *See, e.g., In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 658 F.2d 1355, 1361 n.7 (9th Cir. 1981) ("[T]he attorney-client privilege is served by the certainty that conversations between the attorney and client will remain privileged after the employee leaves."); *Gioe v. AT&T Inc.*, No. CV 09-4545(LDW)(AKT), 2010 WL 3780701, at *1 (E.D.N.Y. Sept. 20, 2010) ("[Privileged] information obtained by the former employee during the period of employment, including information conveyed by counsel during that period, remains privileged

14

[even after the employment relationship ends].") (citing cases). And in this vein, courts have held that the privilege extends to "communications between corporate counsel and a former employee, where these communications . . . relate to communications which themselves were privileged and which occurred during the employment relationship." *Infosystems, Inc. v. Ceridian Corp.*, 197 F.R.D. 303, 305 (E.D. Mich. 2000) (citing *Peralta v. Cendant Corp.*, 190 F.R.D. 38 (D. Conn. 1999)); *see also Hunt v. Merck-Medco Managed Care, LLC*, 340 F. Supp. 2d 554, 558 (E.D. Pa. 2004) (explaining that if communication between former employee and corporate counsel sought to be elicited "concerns conversations [former employee had with corporate counsel that were themselves privileged] that occurred *during* her employment, the communication is privileged") (citing *Peralta*, 190 F.R.D. at 41-42).

Here, then, the privileged legal advice that the Dittgen Group inventors received while employed by Jenapharm did not suddenly lose its protection when the inventors left employment there. Accordingly, subsequent communications between the Dittgen Group inventors and Bayer's representative—who was attempting to get the declaration signed on behalf of Bayer's attorneys—relating to that privileged advice are also protected by the attorney-client privilege. *See Infosystems, Inc.*, 197 F.R.D. at 305; *Hunt*, 340 F. Supp. 2d at 558; *cf. Al-Turki v. Fenn*, 90CIV.4470 LMM THK, 89CIV.6217 LMM THK, 1995 WL 231278, at *2 (S.D.N.Y. Apr. 18, 1995) (concluding that certain content of letter from company's former counsel to former employee "related to [law firm's] prior legal advice to [company] [and is therefore] protected by the attorney-client privilege[,] and there is no evidence of a waiver of the privilege").

The Court has reviewed the 2010 e-mail communications that are before it, and the portions of those e-mails that relate to the mistake do not appear to directly reflect the 2004

15

privileged legal advice. (D.I. 72, exs. 3-4) An August 25, 2010 e-mail from Scherlitz-Hofmann to the Dittgen Group indicates that a draft declaration is attached thereto, which "essentially contains the statement that the CIP application was filed in error and that the [Dittgen Group] inventors . . . named . . . were not the inventors of the [Natazia® regimen claimed in the '771 Application]." (*Id.*, ex. 3 at 2) That statement does not reveal any more substance about the mistake than that already revealed by Bayer—that "the '729 Patent Application [] disclosed the [Natazia®] regimen but mistakenly named the Dittgen group as inventors." (D.I. 63 at 3) A September 17, 2010 e-mail from Scherlitz-Hofmann to the Dittgen Group re-attaches the declaration and requests that the inventors sign the original and send it back to her, as "it is necessary that [the Dittgen Group] declare that [they] are not the inventors" of the Natazia® regimen. (D.I. 73, ex. 4) To the extent that the declarations that were attached to these e-mails reflect 2004 privileged legal advice, however, such content would still be protected by the attorney-client privilege in line with the above principles.[5]

As to Bayer's second argument, Bayer appears to assert that the remaining content of these 2010 communications are protected by the joint-client privilege. The joint-client privilege "applies when multiple clients hire the same counsel to represent them on a matter of common interest." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007); *see also Magnetar Techs. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 479 (D. Del. 2012). "[T]he communications between the clients and the attorney are privileged as against third parties, but not among the joint clients." *Shukh v. Seagate Tech., LLC*, 872 F. Supp. 2d 851, 855 (D. Minn.

---

[5]     To the extent that these declarations contain other content, their import is further addressed below.

16

2012); *see also Teleglobe*, 493 F.3d at 366.

As the party seeking to invoke this privilege, it is Bayer's burden to sufficiently explain why it applies; failure to do so will result in a finding that such content is not privileged. *See Hoffmann-La Roche, Inc. v. Roxane Labs, Inc.*, Civil Action No. 09-6335 (WJM), 2011 WL 1792791, at *6 n.7 (D.N.J. May 11, 2011); *Infosystems, Inc.*, 197 F.R.D. at 306. In its reply brief, Bayer states that these communications "remain privileged as to third parties such as Watson," and then includes a string cite in support that references the joint-client privilege. (D.I. 74 at 2)[6] Notably, beyond this citation, there is no further discussion of the requirements for the joint-client privilege, or how it applies to the instant facts.

For instance, Bayer has failed to establish that Bayer's representative and the Dittgen Group inventors were jointly represented by the same lawyer at the time of the communications at issue. The law is clear that for the joint-client privilege to apply, the clients of the same lawyer must have engaged the common attorney to represent them on a matter of interest to all. *Teleglobe*, 493 F.3d at 362 ("Co-client representations must . . . be distinguished from situations in which a lawyer represents a single client, but another person with allied interests cooperates with the client and the client's lawyer.") (citation omitted); *Robert Bosch LLC v. Pylon Mfg.*

---

[6] Specifically here, Bayer cites to: (1) Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 312 (5th ed. 2007), for the proposition that "[a]fter a falling out between parties with a common interest, any privileged communications exchanged between them or by one of them with joint counsel retains its privileged character in respect to litigation with third parties"; (2) Restatement (Third) of the Law, The Law Governing Lawyers § 75(1) (2000), for the proposition that "[i]f two or more persons are jointly represented by the same lawyer in a matter, a communication of either co-client that relates to matters of common interest is privileged as against third persons . . . ."; and (3) *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 366 (3d Cir. 2007), for the proposition that "when parties with a common interest become adverse, the privilege protects communications from compelled disclosure to third parties but not between the parties themselves[.]" (D.I. 74 at 2)

17

*Corp.*, 263 F.R.D. 142, 145 (D. Del. 2009) (explaining that the joint-client privilege "begins

when the co-clients convey their desire for representation, and the lawyer accepts") (internal

quotation marks and citation omitted); *see also Shukh*, 872 F. Supp. 2d at 855 (explaining that

the joint-client privilege "only attaches if an attorney-client relationship is formed"). Bayer has

not established that the Dittgen Group inventors who were a part of the 2010 communications at

issue—at least some (if not all) of whom no longer worked for Bayer at the time of these

communications—had engaged a common attorney with respect to the alleged mistake. Simply

because the Dittgen Group consulted with and retained independent counsel in the Fall of 2011

does not automatically mean that they were represented by Bayer's attorneys before that in 2010.

And Bayer's bare citation to authority regarding the joint-client privilege does not do the job of

establishing that a co-client relationship existed.[7]

---

[7]    Indeed, in its opening brief, Bayer appears to rely on the common interest doctrine—which is separate and distinct from the joint-client privilege, *Teleglobe*, 493 F.3d at 363 & n.18—in support of its position. (D.I. 71 at 6 (claiming that all communications between Bayer and Dittgen Group inventors relating to how to address the co-pending applications, following the discovery of the mistake, were privileged and citing to *Research Inst. for Med. & Chem. Inc. v. Wis. Alumni Research Found.*, 114 F.R.D. 672, 678-79 (W.D. Wis. 1987) for the proposition that "attorney-client privilege extends to communications with inventors under the community of interest doctrine")) This reliance on the common interest doctrine renders Bayer's position as to whether the Dittgen Group and Bayer were engaged in joint representation in 2010 with respect to the alleged mistake all the more unclear. *See Teleglobe*, 493 F.3d at 359 (explaining that the common interest doctrine "comes into play *when clients with separate attorneys* share otherwise privileged information in order to coordinate their legal activities") (emphasis added). However, because this dispute relates to communications between Bayer and the Dittgen Group at a time when most or all of the Dittgen Group were no longer employed by Bayer, but when Bayer nevertheless asserts that the inventors were represented by Bayer's own lawyer, it appears that Bayer intended to invoke the joint-client privilege instead of the common interest doctrine. (D.I. 74 at 2); *see also Teleglobe*, 493 F.3d at 366. Were Bayer in some way relying on the common interest doctrine to protect these communications, it similarly has not met its burden to show the doctrine's applicability, as it fails to recite the doctrine's elements, let alone establish each element. (D.I. 71 at 6) It was Bayer's burden to demonstrate the applicability of the doctrine by showing that an underlying privilege had been established and

Additionally, application of the joint-client privilege requires that the co-clients each

share a common legal interest. *See Teleglobe*, 493 F.3d at 363 (noting that joint client

relationship is limited "by the extent of the legal matter of common interest"); *Robert Bosch*

*LLC*, 263 F.R.D. at 145 (same). Bayer makes no concrete argument nor cites to any documents

demonstrating that the Dittgen Group and Bayer had a common legal interest at this time as to

the '771 Application (and as to how the status of that application relates to the alleged mistake

involved with the filing of the '729 Application) or another type of common legal interest

relevant to the communications.[8]

---

that: (1) the communications at issue were made by separate parties in the course of a matter of common legal interest; (2) the communications were designed to further that common legal interest; and (3) the privilege had not been waived. *See MobileMedia Ideas LLC v. Apple Inc.*, 890 F. Supp. 2d 508, 515 (D. Del. 2012); *In re Leslie Controls, Inc.*, 437 B.R. 493, 497 (Bankr. D. Del. 2010); *see also Prowess, Inc. v. Raysearch Labs. AB*, Civil Case No. WDQ-11-1357, 2013 WL 247531, at *4 (D. Md. Jan. 18, 2013) (finding that party failed to meet its burden of demonstrating the applicability of the common interest doctrine where, *inter alia*, party "failed to explain . . . how [subject] communications were shared as part of an ongoing common legal enterprise").

[8]     Even if Bayer had attempted to meet its burden with respect to either the joint-client privilege or common interest doctrine, it is doubtful that Bayer would have succeeded. For one thing, whether Bayer intended to assert the joint-client privilege or the common interest doctrine, both require the clients to share a common legal interest. *See Teleglobe*, 493 F.3d at 363. Here, Bayer was trying to convince the Dittgen Group inventors to sign a declaration disclaiming inventorship of the Natazia® regimen and claiming that other persons (Endrikat and Duesterberg) were the true inventors. Since at least some members of the Dittgen Group had a different view than Bayer as to the content of the declaration, and the Dittgen Group ultimately did not sign the declaration, it is unclear how Bayer and the Dittgen Group could be said to have shared a *common* legal interest with respect to the situation. *Cf. Katz v. AT&T Corp.*, 191 F.R.D. 433, 438 n.6 (E.D. Pa. 2000) (concluding that parties did not prove that they shared an identity of interests so as to invoke the common interest doctrine where the interests of the parties were clearly adversarial and the negotiations were conducted at arms length); *Union Carbide Corp. v. Dow Chem. Co.*, 619 F. Supp. 1036, 1050 (D. Del. 1985) (finding no common interest between plaintiff corporation and inventor where documents related to an issue of inventorship that arose between the parties, and it "appears that the parties approached this issue at arms length, each asserting a position directly in conflict with the other"). In any event, it was Bayer's burden in

Finally, with respect to the draft declarations that were attached to the 2010 communications, (D.I. 72, exs. 3-4), Bayer asserts that the attorney-client privilege extends to any such draft declaration authored by Zelano (i.e., "to documents that [] Zelano and Bayer considered filing (but never in fact filed) with the Patent Office")—presumably including the draft or drafts sent to the Dittgen Group in 2010. (D.I. 71 at 6)  But the cases to which Bayer cites in support of its position are inapposite as to these draft declarations.  (*Id.*)  In *Rohm and Haas Co. v. Brotech Corp.*, 815 F. Supp. 793 (D. Del. 1993), the draft patent application held to be protected by the attorney-client privilege was sent by a co-inventor to a patent attorney and contained markings and notes on it apparently made by the attorney.  *Rohm and Haas*, 815 Supp. at 795.  This Court found that the document reflected each element of the attorney-client privilege, since the inventor was writing to the attorney as a client; the attorney was a member of the bar and received and acted on the information as a lawyer; the communication related to information provided by the inventor to the attorney to obtain legal advice and assistance; and the communication was kept confidential.  *Id.* at 796.  Similarly, the court in *In re Rivastigmine Patent Litig.*, 237 F.R.D. 69, 86 (S.D.N.Y. 2006) explained that "[t]o be privileged, a draft patent application, like any other document, must be a communication between an attorney and a client, which was created by the client or the attorney for the purpose of obtaining or providing legal advice or services, and which was intended to be confidential."

Bayer has not met its burden of demonstrating that these versions of the draft declaration meet these requirements. *In re Grand Jury*, 705 F.3d at 160; *Veolia Environnement*, 2013 WL 5779653, at *4.  As explained above, Bayer does not establish, *inter alia*, that the inventors were

---

the first instance to make the argument to the Court, and this it failed to do.

Zelano's clients at the time that the declaration was prepared and sent to them. Thus, beyond any

direct reference to 2004 privileged legal advice that they may contain, Bayer has not established

that the content of these attached draft declarations would be protected from disclosure.[9] *See Al-*

*Turki*, 1995 WL 231278, at \*2 (holding that portions of communication between counsel and

former employee that did not include reference to prior privileged communications between the

parties were not protected and should be disclosed).

Accordingly, the Court concludes that to the extent the 2010 communications between

Bayer and the Dittgen Group inventors (including any draft declarations attached to such

communications), reflect the privileged advice that the inventors received in 2004 while still

employed at Jenapharm, such content is privileged. However, beyond such content, these

communications may not be protected from disclosure, nor may any facts relating to the mistake

that are disclosed in those communications.

## C.  Waiver of Privilege

Watson also argues that Bayer waived any applicable privilege in details relating to the

mistake.[10] More particularly, Watson asserts that Bayer's statement to the PTO that a "mistake"

---

[9]  Bayer has not asserted that the work product doctrine is applicable to this dispute.

[10]  The United States Court of Appeals for the Third Circuit has not specifically ruled
on which party bears the burden of proving a waiver of the attorney-client privilege. *See
TransWeb, LLC v. 3M Innovative Props. Co.*, Civil Action No. 10-cv-4413 (FSH)(PS), 2012 WL
2878076, at \*7 (D.N.J. Apr. 12, 2012); *Traficante v. Homeq Servicing Corp.*, Civil Action No. 9-
746, 2010 WL 3167435, at \*1 (W.D. Pa. Aug. 10, 2010). The district courts within the Third
Circuit have expressed discordant views on the issue. Some courts state that the party asserting
waiver has the burden of proving waiver occurred. *See, e.g., Brigham & Women's Hosp. Inc.*,
707 F. Supp. 2d at 469; *Martin Marietta Materials, Inc. v. Bedford Reinforced Plastics, Inc.*, 227
F.R.D. 382, 389 (W.D. Pa. 2005). Other courts hold that the party asserting the privilege has the
burden to prove non-waiver of the communication. *Hoffmann-La Roche, Inc.*, 2011 WL
1792791, at \*10; *Greene, Tweed of Del., Inc. v. DuPont Dow Elastomers, L.L.C.*, 202 F.R.D.

had been committed by the other inventive entity, and that a confirmatory document would soon

be filed, constituted a waiver of any privileged information relating to the subject matter of the

alleged mistake. (D.I. 61 at 4; D.I. 72 at 8-10)

As Bayer correctly points out, though, (D.I. 71 at 7), the legal authority is clear that only

"where a disclosure of *the contents of an attorney-client communication* for strategic beneficial

purposes is made to the PTO, then the privilege is waived on the same subject matter." *Samsung*

*SDI Co. v. Matsushita Elec., Inc.*, No. CV 05-8493-AG (SHx), 2007 WL 4302707, at *1 (C.D.

Cal. Jan. 24, 2007) (emphasis added); *cf. Teleglobe*, 493 F.3d at 361 ("When one party takes

advantage of another by selectively disclosing otherwise privileged *communications*, courts

broaden the waiver as necessary to eliminate the advantage.") (emphasis added). Here, Bayer's

limited statement to the PTO did not disclose or reference the *contents* of any attorney-client

communications. (D.I. 61, ex. 12 at 11) Instead, the statement merely informed the PTO that a

"mistake" had been made, without revealing the substance of any privileged communications that

related to the alleged mistake or may have caused it to occur. This is not enough to effect a

waiver of privileged communications; there is a meaningful difference between a *factual*

*statement* that a mistake occurred, and a reference to *communications* between counsel and the

client about the mistake. *See Monsanto Co. v. E.I. Dupont De Nemours & Co.*, No.

4:09CV00686 ERW, 2011 WL 1773988, at *1 (E.D. Mo. May 10, 2011) (rejecting argument that

disclosures to PTO amounted to waiver of privileged communications where plaintiffs' "reissue

application for the [patent-in-suit] or its supplemental disclosures with respect to that application

---

418, 423 (E.D. Pa. 2001). The Court need not resolve this issue, as even were it to consider
Bayer to have the burden, Bayer would have met that burden here.

[did not] specifically contain[] the contents of any confidential communications; those filings simply indicate[d] that the predecessor patent" contained an error).[11]

Watson also argues that Bayer's statement that it would provide the PTO with further details about the alleged mistake—something it later did not do—amounted to waiver. (D.I. 61 at 4) However, Bayer is correct that "[w]aiver only occurs by a disclosure itself, not a promise or intent to disclose." (D.I. 71 at 8); *see QBE Ins. Corp. v. Jorda Enters., Inc.*, 286 F.R.D. 661, 665 (S.D. Fla. 2012) (where plaintiff and plaintiff's counsel merely announced an intent to disclose privileged information at future hearing, finding no waiver "as the actual voluntary disclosure (not a prediction or promise that disclosure will be made in the future) is the waiver-triggering event"); *see also Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 341 (9th Cir. 1996) ("[A] mere intention to waive the privilege, evidenced by only a promise . . . does not waive the privilege. . . . The triggering event is disclosure, not a promise to disclose."). Thus, Bayer's later unfulfilled promise to provide an explanatory document did not equate to a waiver of all prior privileged

---

[11] To the contrary, in the cases Watson cites in support of its waiver argument, the disclosing parties revealed information about the *content* of attorney-client privileged communications to the PTO. *See In re VISX, Inc.*, 18 F. App'x 821, 822, 824 (Fed. Cir. 2001) (finding waiver where party filed an Information Disclosure Statement with PTO stating that no one working for the party had directed its British patent agent to make the statement to the PTO, such that the party had "made representations about the contents of [attorney-client] communications" to the PTO); *Samsung SDI Co.*, 2007 WL 4302707, at *1 (finding that, where defendant's patent prosecution counsel submitted an Information Disclosure Statement to the PTO—disclosing a publication and certifying that the attorney had made reasonable inquiry into the knowledge of all involved inventors, attorneys, and every other person who was associated with the inventor about whether those persons knew of the publication—that this statement waived any privilege that may have applied to the attorney's inquiry); *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 237 F.R.D. 618, 620, 625 (N.D. Cal. 2006) (finding waiver where plaintiff submitted to PTO declarations relating to inventorship of the subject application that contained segments of otherwise privileged communications between plaintiff and its attorneys).

23

communications relating to the alleged mistake.

### D.    Non-Privileged Factual Details Regarding Alleged Mistake

Following its conclusions with respect to the privileged nature of the referenced communications relating to the mistake and waiver, the Court is left with the overarching issue of whether there remains any additional factual details (other than those disclosed in the above communications found to be not privileged) about the mistake that can be shared in response to Watson's Interrogatory, without disclosing the substance of privileged communications. *See Upjohn*, 449 U.S. at 395 (attorney-client privilege protects only communications, not underlying facts). As noted above, there are indeed various communications relating to the mistake that are protected by the attorney-client privilege (and others that are not, but that do not provide much illuminating information about the mistake, such as the 2011 communications between Bayer's representative and the Dittgen Group). However, it is also true that the mistake allegedly occurred due in part to the mistaken thoughts and beliefs held by the two primary attorneys involved in the filing of the '729 Application—more particularly, that in advance of the filing of the '729 Application, Jenapharm's counsel did not communicate certain facts to Striker, and that Striker assumed certain facts to be the case, when they were not. (D.I. 72 at 1, 3; Zelano Declaration at ¶¶ 12-13) This, coupled with Jenapharm's counsel's uncommunicated understanding of certain provisions of U.S. patent law, assertedly led to the mistake at issue. (D.I. 72 at 1, 3; Zelano Declaration at ¶¶ 12-13)

Bayer does not specifically address whether the attorney-client privilege attaches to protect uncommunicated facts, or facts regarding the uncommunicated thought processes of counsel. Instead, it more broadly argues that *any* details regarding the mistake in some way

relate to the seeking and receiving of legal advice, and thus that any facts regarding the filing of

the mistaken '729 Application that it has not already disclosed are privileged. It asserts that it

therefore cannot provide any additional information about the mistake without directly or

indirectly revealing the content of communications and advice on the subject. (D.I. 63 at 3; D.I.

71 at 1-2)

The United States Court of Appeals for the Third Circuit has indicated that an attorney's

thought processes are not protected by the attorney-client privilege. *See Montgomery Cnty. v.*

*MicroVote Corp.*, 175 F.3d 296, 304 (3d Cir. 1999). Some courts addressing this issue seem to

distinguish between an attorney's communicated thoughts and uncommunicated thoughts, stating

only that the latter category of thoughts are not privileged (perhaps because revelation of an

attorney's communicated thoughts could effectively reveal the content of attorney-client

communications). *See Aiossa v. Bank of Am., N.A.*, No. CV 10-01275(JS)(ETB), 2011 WL

4026902, at *11 (E.D.N.Y. Sept. 12, 2011) (noting that "the attorney-client privilege does not

protect an attorney's thoughts which were not communicated to the client"); *Starr Int'l Co., Inc.*

*v. Am. Int'l Grp, Inc.*, No. 05 Civ.6283 B SJ MHD, 2006 WL 3851148, at *1 (S.D.N.Y. Dec. 27,

2006) (noting that "some [deposition] questions called for disclosure of an attorney's

uncommunicated knowledge or understanding that was not shown to be triggered by pending or

anticipated litigation, and such questions do not necessarily trench on any privilege or

immunity"); *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 490 (S.D.N.Y.

1993) ("The [attorney-client] privilege does not [] protect an attorney's uncommunicated

thoughts[.]").

Here, as noted above, the mistake allegedly occurred because Jenapharm's counsel did

25

not communicate certain facts to Striker, and because the two attorneys thus had an uncommunicated misunderstanding, related in part to Jenapharm's counsel's uncommunicated understanding of American patent law. (Zelano Declaration at ¶¶ 12-13)  In line with the caselaw, and in the absence of specific argument from Bayer addressing why these uncommunicated facts, thoughts and understandings of the relevant parties that led to the mistake's occurrence constitute privileged material, the Court concludes that Bayer cannot protect them from disclosure in response to Interrogatory No. 7, on the grounds that they are protected by the attorney-client privilege. *Cf. DSM Desotech Inc. v. 3D Sys. Corp.*, No. 08 C 1531, 2011 WL 117048, at *4 (N.D. Ill. Jan. 12, 2011) (rejecting plaintiff's conclusory argument that topic of when its in-house counsel became aware of a product is not a discoverable fact because the purported facts are intertwined with the seeking of or rendering of legal advice, as plaintiff failed to establish that counsel's awareness of the product "is inextricably intertwined with confidential communications made for the purpose of obtaining legal advice or the legal advice itself"); *Gen-Probe Inc. v. Becton, Dickinson & Co.*, Civil No. 09cv2319 BEN (NLS), 2010 WL 2011526, at *2-3 (S.D. Cal. May 19, 2010) (requiring defendant to provide supplemental response including all non-privileged foundational facts regarding how its patent counsel first learned of asserted patents and what actions, if any, it took, as the attorney-client privilege "does not extend to foundational questions that do not require the disclosure of any legal advice sought or provided"); *Starr Int'l Co., Inc.*, 2006 WL 3851148, at *1 n.2 (in context of deposition question, noting that "if the question seeks only the witness's . . . knowledge at a pertinent time, that does not qualify it as coming within the attorney-client privilege, even if the witness was an attorney, unless the question seeks in substance the contents of a communication

26

between the attorney and client").

Bayer also asserts that all of the circumstances under which the mistake was discovered, including the identity of the individual who discovered the mistake, are privileged. (D.I. 71 at 1-2; D.I. 74 at 1) However, Bayer has not presented argument or cited to any legal authority in support of the proposition that the identity of the individual who discovered the mistake, even to the extent that individual is an attorney, is protected by the attorney-client privilege. Therefore, the Court finds that Bayer cannot protect this fact from disclosure in response to Interrogatory No. 7, on these grounds. *See, e.g., Intervet, Inc. v. Merial Ltd.*, 256 F.R.D. 229, 232-33 (D.D.C. 2009) (where interrogatory sought date on which plaintiff became aware of a particular patent, identity of person who became aware of the patent, and circumstances under which patent came to plaintiff's attention, requiring plaintiff to provide, *inter alia*, "name(s) of the person(s) who first discovered" the patent, as court "[could not] see any reason why the identity of the person or group of people who first came across the [] patent . . . can be withheld on the basis of privilege[,]" even if that person was an attorney).

As to the remaining circumstances relating to the discovery of the mistake, Bayer does not provide sufficient detail to enable the Court to opine here on the privileged nature of such circumstances. The background facts about the circumstances under which the mistake was discovered are not in themselves protected by the attorney-client privilege; the substance of confidential attorney-client communications relating to that discovery are. *See id.* at 232; *see also Vasudevan Software, Inc. v. Int'l Bus. Machs. Corp.*, No. C 09-05897 RS (PSG), 2011 WL 1599646, at *2-3 (N.D. Cal. Apr. 27, 2011). Therefore, in response to Interrogatory No. 7, Bayer must also disclose the circumstances under which the mistake was discovered, unless there is a

credible claim that disclosure of such circumstances would reveal the substance of an attorney-client privileged communication. If Bayer believes that it has such a claim, it must clearly state its basis in a manner that permits the Court to evaluate its claim. *See* Fed. R. Civ. P. 26(b)(5); *see also Vasudevan Software, Inc.*, 2011 WL 1599646, at *3 (requiring plaintiff to supplement interrogatory response to provide a description of any and all circumstances by which prior art became known to individuals involved in prosecution of the patent-in-suit, and to extent plaintiff "withholds information about particular circumstances because such disclosure would reveal the substance of an attorney-client communication," requiring plaintiff to "tender a sufficient basis upon which that privilege claim can be based"); *Intervet, Inc.*, 256 F.R.D. at 233 (same, as to circumstances under which a particular patent came to plaintiff's attention).

E.      **Summary of Conclusions Regarding Response to Interrogatory No. 7**

In sum, then, while most of the categories of asserted privileged material identified by Bayer are protected from disclosure, Bayer has failed to meet its burden as to the nature of 2010 communications between Bayer and the Dittgen Group (that do not directly reference 2004 attorney-client privileged communications), and has conceded that the 2011 communications are not privileged. Moreover, setting aside the communications relating to the mistake, Bayer has failed to meet its burden to demonstrate that certain uncommunicated facts, thoughts and knowledge held by Jenapharm's counsel and Striker, as well as the identity of the individual who discovered the mistake, are protected by the attorney-client privilege. Finally, Bayer must provide information regarding the remaining circumstances under which the mistake was discovered, unless there is a credible claim that to do so would reveal the substance of an attorney-client communication. Therefore, the Court ORDERS Bayer to supplement its limited

response to Watson's Interrogatory No. 7 with a complete and responsive answer, in line with the decision herein, that provides all non-privileged details regarding: (1) how the alleged mistake was made, (2) the dates and circumstances under which the alleged mistake was committed and discovered, and (3) the five persons most knowledgeable about the commission of the alleged mistake and its discovery.[12]

## IV. CONCLUSION

For the reasons outlined above, it is hereby ORDERED that Watson's motion to compel a complete and responsive answer to Interrogatory No. 7 is GRANTED to the degree set out above, in that Bayer is ordered to provide Watson with an answer to Interrogatory No. 7 corresponding to the requirements set out above, **within fourteen days** of the date of this Memorandum Order.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **April 1, 2014** for review by the Court, along with a submission

---

[12]     Even had Bayer been correct that *no* non-privileged communications or information existed regarding the alleged mistake, it would still have had to respond to the interrogatory with details regarding (1) the dates that the alleged mistake was committed and discovered and (2) the names of the five persons most knowledgeable about the alleged mistake and its discovery. The Court is aware of no good argument as to why those details would be privileged. *Cf. Vasudevan Software, Inc.*, 2011 WL 1599646, at *2 (rejecting plaintiff's argument that interrogatory seeking dates and circumstances by which individuals learned about pieces of prior art would reveal substance of privileged communications as "the date of a communication and its general subject matter is information routinely disclosed in privilege logs to establish that the content of the communication is privileged"); *DSM Desotech Inc.*, 2011 WL 117048, at *4 (finding that deposition notice topics requesting, *inter alia*, certain dates and identities of persons involved in prosecution of patents did not seek information protected by the attorney-client privilege, as objecting party "has not explained how such information would directly or indirectly reveal the *substance* of a confidential communication") (emphasis added). Bayer has already provided at least some of this information in its briefing here.

demonstrating why there is good cause for the redactions and why disclosure of the redacted

material would "work a clearly defined and serious injury to the party seeking" redaction. *Pansy*

*v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and

citation omitted). The Court will subsequently issue a publicly-available version of its

Memorandum Order.

Dated: March 20, 2014

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

30